Mr. Garfinkel, we're calling our first case in Re Orexigen Therapeutics and you, I understand, are counsel for appellants in this. You have the floor. Thank you, Your Honor. I'd like to reserve three minutes of rebuttal time, if that's permissible. Done. Yes. Your Honor, Jeff Garfinkel of Buckhalter appearing on behalf of this appeal, this very important bankruptcy appeal. The underlying appeal involves a bilateral contract. Let me repeat that. A bilateral contract between McKesson and the debtor Orexigen. Yeah. Under that. Let's just, let's cut right to the chase. We've all read the briefing. When you emphasize this is a bilateral contract, of course, the bankruptcy court and the district court said it may be a contract, but what you're trying to enforce is a debt owed to a separate corporation. You didn't have to set up a subsidiary, but you did. You didn't have to run it through the subsidiary, but you did. You could have set a lien or given a lien for the subsidiary to hold against the accounts receivable, but you didn't. You did what you did. You set it up. In fact, I was struck by the opening line of your brief, which was this was arranged between sophisticated parties. Indeed. So why, having multiple ways that you could have had what would clearly be a mutual set off between two parties, why, having chosen to put a third party in the mix, should we be paying attention when you say bilateral? Your Honor, because the bilateral contract gives rise to a claim by McKesson under the Bankruptcy Code's definitions of claims, and that is the dispositive issue under Section 553 of the Bankruptcy Code. McKesson, under this contract... 553 speaks to creditors, and isn't the actual creditor here NPRS? To whom funds the actual payment will go? Your Honor, the payment will go to McKesson because McKesson has the enforceable obligation as against Erexogen, and the right to payment, as it defined under the Supreme Court's decisions in Davenport and Johnson, is a right payment. Mr. Garfinkel, you're going around, I think you're going around the question a little bit. I understand why you're doing it, but the payment only gets to McKesson after it goes through NPRSA, right? I mean, you don't get, you don't get money directly from them under any contract. You get money as potentially a set-off because of what NPRSA has got. No? No, Your Honor. It's both. Both parties have a claim. How, how is it, how is it both except for your claim that what comes to our affiliate, we have some right to as well? That's your, that's the contract language you lean on. But there's never a direct straight to you payment. It's always through the subsidiary, isn't it? No. In fact, the bankruptcy court found that McKesson has a claim under the contract. That claim arises by virtue of the definitions within the bankruptcy code, a right to payment under 1015 and 1022. McKesson's claim is not... Well, the bankruptcy court accepted that as a result of the stipulations, but why should we? As a threshold matter, 563 is only dealing with creditors, and it is a collateral arrangement. And, and while we inquired about your views on piercing the corporate veil and whether, whether McKesson and its subsidiary should be viewed as alter egos, the answer was no, that was not an argument you're pressing. So if we have two independent, independent corporate entities, one, one an account debtor and the other the creditor, why should we have an arrangement outside of the bankruptcy code itself that McKesson is, has taken over the role as, as a creditor? Because under state law, including the prudential decision from the California Supreme Court, that agreement is enforceable both by McKesson and PRS. Both have a claim. How does that speak to the bankruptcy law? Why does, why does it matter? I mean, you've, don't get me wrong, we've read, we have read your brief, and, and so I understand you're leaning on, on California law, but explain why that should override Section 553A, which is the operative bankruptcy provision everybody understands that, and it speaks in terms of mutuality. It only speaks to mutual debt owing by such creditor to the, to the debtor. There's not a mutual claim component to 553. Word mutual only appears once in that statute. So let's look at the statute. Why shouldn't we follow the path laid out for us in SEMCRUD? Aren't the facts almost identical? No, SEMCRUD involved two debtors and not two creditors. SEMCRUD also ignored, inexplicably, the Supreme Court's definition of right to payment. In fact, SEMCRUD never cited Davenport or Johnson, which are the controlling cases, on what is a right to payment. It is nothing more and nothing less than an enforceable obligation. Without question, as agreed to, and as acknowledged by the bankruptcy court, McKesson Corporation had an enforceable obligation, as against Erection, to retain the $6.9 million. That gives rise to a claim. That claim was asserted in the bankruptcy case. It was never challenged. And in fact, 553A1 deals with this premise. 553A1 addresses, if McKesson didn't have a claim, then the onus is to... Otherwise, McKesson has a lot of claim. And there's never been an objection to McKesson's claim. McKesson has a claim. I don't think... Hold on. Nobody's... What I take it to be, the discussion here, is not whether McKesson might have some claim somewhere. It's whether McKesson's got a claim to this money. This money that you're saying it's got a claim to. That's the whole issue here. I mean, nobody's confused, I don't think, about, you know, whether it's possible for McKesson to have a claim. The question is, can it characterize what it claims as a set-off right as a claim in its own right? And all of the law that I've been looking at speaks of mutuality in the set-off context as parties who have a bilateral relationship and one is owing money and the other is owing money and they can do some set-off instead of trading. It's a very limited thing. Now, without taking us into the definition of payment in the Supreme Court law, stick with us on the way the law has developed around 553A. Do you have any case going your way on that? Or is it all in the Semcrude line? No, Your Honour, we've cited to the court the United Sciences case out of the Fifth Circuit. We cited Professor Brubaker's law review article which traces the 300-year history of set-off rights. No disrespect to Professor Brubaker, I'm talking about the law. I'm talking about the law here, right? So, authority in this context, I mean, do you have case law, statute, regulation, anything like that? All right, now, talk to us about that Fifth Circuit case because I understood your opponents to be saying, look, that supports their side, it doesn't undercut it because of the framing of the bank's relationships. You explain to us why they're wrong and why you're right. Yeah, Semcrude, I'm sorry, Semcrude cites United Sciences. United Sciences dealt with a bank that had a contract with a debtor, United Sciences, and it also, that debtor had a number of purchasers who rescinded contracts for which the debtor owed money. The agreement between United Science and the debtor allowed for set-off of the amounts owed to credit card rescinding purchasers. That is, and the Fifth Circuit said, in the absence of an agreement, that would be an improper triangular set-off. In this case, that being United Sciences, there was an agreement, and that agreement satisfies the mutuality requirement of 553. So therefore, the trustee's argument, the debtor's arguments as to unenforceability of the set-off rights failed. That is on all fours with where we are in this case. We have an agreement. This is not an improper triangular set-off. We have an agreement, the debtors and McKesson agreed to this, and it's enforceable under California law under the prudential decision. So if that's the case, and my quick look at Semcrude and Lehman Brothers and the cases that have followed on it indicate that they don't think that that Fifth Circuit decision overrides their reasoning or what they understand to be the plain meaning of the code. But even if we were to assume for the sake of argument that that were true, that that's what the Fifth Circuit did, why would we want to follow that when the policy here arguably is that when you've got two parties together, it's not gonna be a harm to the rest of the world if they get to have a set-off. But when you start adding other parties in, what you really have are silent liens. And those silent liens don't give the world notice. And so you should not allow set-offs in those circumstances. Just as a policy matter, if we assume that the Fifth Circuit spoke the way you say it did, why would we want to follow that and not reject it and say it's bad policy? Well, number one, we have the Third Circuit's own decision in 1984 in the Levy-Schweiker case, which the Third Circuit acknowledged that set-off rights are a secured claim. Anyone that transact business with a corporation understands that set-off rights always potentially exist between a couple parties. You're putting the rabbit in the hat, Mr. Garfinkel. Nobody's arguing that there aren't such things as set-off rights. The question is, is the thing you've got a set-off right? And you're claiming it is, and your opponent is saying it's not because it's triangular, so they've got no set-off right. So that's what I'm trying to get at, and I think Judge Restrepo and Judge Kraus, I don't wanna speak for him, but I think we're all interested to hear you say it. Explain why, as a policy matter, it would be good for the system to say, you know what, it's okay, in fact, it's a good thing if there are other parties out there that nobody else knows about, because there's some contract someplace out in California. It's good for the system if those sort of silent liens are out there. Why would we do that? It's good for the system in terms of it promoting economic efficiency between parties, lowering economic transaction costs, such that the parties who are negotiating these deals have an ability to know that they have credit protection and a credit enhancement by virtue of the set-off right. But as to a policy matter, to answer, my time has run out, but let me address your question, Judge Jordan. As a policy matter, anyone that is lending or considering lending on accounts receivable must understand that the counterparty has defenses to that account receivable. This was a point that was raised in the Affinequest case, which the appellees cite. They take their lien against accounts receivable subject to all the account debtor's defenses. Defenses include, it's not a secret lien, it is a right which exists with the account. We're having a technical issue. I'm sorry, we just missed, I don't know whether you froze for everybody else, but I think we sort of lost your last sentence or at least I did, Mr. Garfinkel. So if you'll indulge us and just repeat the very last sentence. You don't have to go on for another five minutes. We kind of got it right to the very end. My point being is, I was talking about the Affinequest case out of the Indiana Magistrate case. And anyone that lends or is considering the account receivable as a part of their collateral takes it subject to all the defenses of an account debtor. Those defenses could be whatever they be, including set off. So no one is relying upon on a secret lien here. And that's the point I was getting. This is a simple right of payment, also a contractual defense to the account payable. Okay. All right. Thanks very much, Mr. Garfinkel. We'll have you back for your rebuttal. Mr. Murphy. Thank you very much, Your Honor. Bennett Murphy of Quinn Emanuel, Urquhart and Sullivan for the athletes. I think I'll follow the court's lead and go right to the statute. Under the plain meaning of the statute, which every court has concluded looking at the question, a contractual triangular set off. Even if there is such a right, is not a right that's preserved under section 553. Statute says the rights preserved consist of rights to a creditor to offset a mutual debt owed by such creditor. Here, that's McKesson, which owed an obligation to the debtor against a claim of such creditor, which must be McKesson against the debtor. Why don't you speak, go straight to the United Sciences case. Because when you say, hey, all the cases say this, that's what they say. No, all the cases don't say this. United Science doesn't say that. Well, United Sciences is actually not a case that presents any tension between our position and what the Fifth Circuit decided. In the United Sciences, the arrangement was between three parties. There was a triangular situation. Two of them were banks. One was the merchant account bank, which had an agreement with the debtor who sold goods that the credit card proceeds that were received from customers would be paid to it. Meanwhile, same debtor had an obligation to the issuing bank of the credit cards to pay chargements. That's whenever a customer returns the goods and is entitled to a credit. However, the triangle was collapsed by the agreement between the parties. The debtor there, unlike this debtor, agreed with the merchant bank that it would pay the merchant bank. It would pay the merchant bank the entirety of any credits that arose by reason of the charge back. The parties here did not agree to that. McKesson never agreed that it would, that the debtor was entitled, I'm getting confused, but there is no provision that says that there is a claim by McKesson to assert whatever is owed to its subsidiary. So Mr. Murphy, are you saying that they could have, they could have contracted around 553A? If they know your honor, they could have contracted into it. Just as your honor pointed out, if parties wish to reach an agreement, they can define what the agreement is. And the agreement here was not that McKesson would pay what was owed to its subsidiary. If it had, then there may be a claim that would qualify it as such creditor that is entitled to assert the set-off as to its own obligations. But that's not the case here. The principle of not- If we're going to allow, if we're going to allow parties to contract around via enforceable state law provisions, the 553A, then why shouldn't we look here to the expectation of the parties that this set-off would work that way? And as they've alleged, and then put into motion with McKesson actually putting in the claim in this case. I guess I have two responses to that. One is that these sophisticated parties did know how to contract. And if there had been an obligation on the debtor's part to pay McKesson whatever it owed McKesson subsidiaries, the contract would save them. Instead, they agreed to a different contract. And this is what their expectations were defined by the contract. That was not that McKesson could receive payment of whatever was owed to its subsidiary. That's that it would receive, that it would, pardon me, pay less. If it acquired a right under this clause of the distribution agreement, it was solely a right to pay less than it otherwise would pay by reason of the amount owed to its subsidiary. If, for example, McKesson owed nothing under the distribution agreement, it had no right to collect the debt owed to the subsidiary. And therefore there's no right of payment under this theory that's been advanced by McKesson only on appeal that was not raised. Why isn't this, the hard lien that you folks are doing, by lien, I mean, L-E-A-N on SEMCRUD misplaced, Mr. Murphy? Because in that instance, you had two sets of affiliated entities. They'd been doing business under some umbrella agreement for 15 years. There was some complexity gone. They're here, you got a debtor who owes money directly to a subsidiary. It's pretty straightforward, nobody's confused. And as Mr. Garfinkel said, hey, people know all the time that there can be defenses to trying to attach accounts receivable. It's pretty straightforward commercial arrangement. Why isn't SEMCRUD distinguishable? And this is sort of an arrangement where form is being exalted over substance. Thank you. There is one distinction in the facts. And that is that as council noted, the triangle was open on the debtor side rather than the creditor side in SEMCRUD. But we have the Lehman decision where the triangle goes the other way and not surprisingly, I would suggest where the topic is mutuality, the direction of the triangle really doesn't matter. Here we have two entities that are distinct corporate entities. There's no piercing of the corporate veil. And those two entities have their own rights vis-a-vis the debtor. McKesson had an obligation to pay the debtor and the debtor had an obligation to pay the subsidiary for marketing. It could have been done differently. The parties could have contracted between two entities. McKesson could have received a direct payment rate, but they didn't. Now, let me talk about expectations from the creditor side. My clients held notes under a $165 million indenture where they were secured by all of the income of this company. The majority of its income was actually paid through McKesson. Monthly receipts of $6.9 million essentially represented the cashflow of this company or most of it. Sadly, there were tens of millions of dollars of junior debt but as one might do the math, the $7 million a month, even if it's only a majority of the debt, wasn't enough to support this debt. I can assure you that while creditors do a lean search, creditors look for public security interests, they would not expect nor would it be equitable or consistent with the bankruptcy code, most importantly, for them to have to be concerned about this situation. We're debt owed for a completely different transaction, which may or may not have been done with subsidiary for marketing services, would somehow choke off the lifeblood of the company, its receipts from selling. But why is it with the other concessions you've made, why isn't that just a question of state law? If California law would, in the context of an agreement framed in these terms, allow McKesson to assert the right to be paid on behalf of its subsidiary because of the set off arrangement, that would be a matter of state law and then they would have that right to payment, right? I mean, you would agree if the state law provided as much. I'll take the assumption as your owner asked that there was an agreement by McKesson to receive full payment of whatever it was, whatever EREC's denoted subsidiary, which I don't believe is the scope. In that instance, if there was a state law right to set off, the right must still pass through this provision of the bankruptcy code. Limiting language is actually- But we don't look to federal law for its interpretation, we're directed by the Supreme Court to look to the state law. So why doesn't California law here in the Prudential case allow for enforcement by McKesson of what should be construed as a right to payment? Well, this is McKesson's Butner argument and it proves far too much. The holding in Butner was not a matter of general principle that state law would always apply to a property interest. The holding in Butner was where either of two things was the case, state law would apply. One would be that there was no congressional command in the words of the decision. That is Congress had not addressed the matter in question, that hadn't provided the rule of decision by the text of the bankruptcy code. Here Congress had. Whatever any right is the term used in section 553, any right of set off is preserved in the bankruptcy code, only if it fits within the limitations of section 553, which this one does for the reasons we've discussed, the term mutuality and the phrase such creditor in the two places it appears. The other decisions following, the more recent decisions following Butner really reached the same result. The decisions in Raleigh and Rodriguez show that while Congress in the words of Raleigh may do what it wants with entitlements, in bankruptcy, where there is, in bankruptcy in that case, there was no indication Congress intended to alter state law. Here they're playing it. I think that's indisputable. They're also- Let me ask you a question, Mr. Murphy, and because we're almost to the close of your time. You go out of your way to note that the bankruptcy court's determination that McKesson was not entitled to set off is reviewed for abuse of discretion. That's how you frame it in your brief. But both sides appear to agree that what we're dealing with here is a pure question of law. What is the meaning of the mutuality carry with it? In this 553A. If that's true, and an error in law is an abuse of discretion, does it make any difference? It would not. I would concede an error of law is equal to, it establishes itself an equitable, I'm sorry, that there was an abuse of discretion by applying the law. But however, there was in the bankruptcy court's decision, an element of its decision, which itself referred to as a decision that was undertaking in its own discretion. If for example, there was no error of law, the bankruptcy court still, its decision still could be supported by its view of the equitable purpose of the limitation on set off to preserve equality of treatment. In this court's own decision- If we got past mutuality, wouldn't you say you have a pretty hard lift? Because here, you had Orexogen, you had McKesson. It's true McKesson chose to operate through a wholly owned subsidiary, but the contractual provision is clear as a bell. Those parties knew exactly what they were doing. And Orexogen expected there was gonna be set off. It's only the intervention of the bankruptcy code that's causing them the difficulty it is, this issue of triangulation, right? I mean, wouldn't that in fact be an abuse of discretion for the bankruptcy court to look at this arrangement very clear on its face and say, as an equitable matter, even though you parties knew exactly what you were doing, I'm not enforcing it. That's not problematic, you don't think? It would be an unlikely path of reasoning that would get to the standard of abuse of discretion. Yeah, okay. Well, Judge Krause, Judge Restrepo, anything further for Mr. Murphy? No, I'm good. All right, thank you. Thanks for your argument, sir. And Mr. Garfinkel, you've got three minutes for rebuttal. Mr. Garfinkel, you need to mute, please. You're muted. You're still muted. And you are still muted. There you go. Can you hear me? Sorry, my apologies. You're good. Let me go back to the statute 553. It is not a limiting statute. It is an enabling statute at its core. The bankruptcy code does not affect the right of a party to set off. It's state law right of set off. Had Erechigen not- And the question is, are you the party entitled to set off? That's what we're arguing about. Absolutely, yes. It's not whether there is a set off, it's whether you get to set it off. Yes. The answer to that is an affirmative yes. Had Erechigen not filed bankruptcy, as Judge Krause noted, McKesson by itself would have had an enforceable right, a right of payment to go directly against Erechigen to recover the 6.9 million. That right passes through to bankruptcy unaffected unless one of the statutory exceptions in 553 applies. And that would include claim disallowance under 553A1. Once McKesson has a claim, which it does under the definitions of 101.5 and 102.2, that's all that's required under 553. So how is it when you say- Go ahead. Go ahead, Judge Krause. How is that approach consistent with the uniformity that we seek in bankruptcy? Because take a complex bankruptcy where you have multiple parties and different setup arrangements in different states, some enforceable, some not. In terms of triangular arrangements, why would we create that kind of chaos around the interpretation of 553A? It's not chaos. It is the teachings of Butner, which says the claim itself is determined based on state law. And state law is different. Let me give you an example. In California, gambling debts are unenforceable while they're enforceable in Nevada. If McKesson was asserting a gambling debt in California as against some third party, it's unenforceable. We always look at the variances in state law as to allowability of claims. And that's what Butner teaches. And it follows through to Raleigh, and it follows again into the Rodriguez case, which focuses on lack of the inability of federal courts to do common lawmaking. The issue here is mutuality. Here we're bounded by the text of the statute. And help me understand where the statute is talking about a right of a creditor to offset not a debt owing, but a mutual debt. In your interpretation of the statute, what work is mutual doing? Mutual merely relates to the mutuality of identity is the parties, one who owes money and one who is owed money the same. And as long as they have both components of the analysis, which McKesson does, then mutuality is necessary. Stop, when you say which McKesson does, in this debt, who is owed the debt from Erexigen? Both. No, who is owed the debt on that? There's a distribution and a services agreement. Under the services agreement, who is owed the debt? Under the services agreement, the NPRS has a claim. Under the distribution agreement, McKesson has a claim. And we're only focused right now on the distribution agreement and the bilateral nature of that claim. There you go. That's what makes this a fascinating case. And we appreciate the counsel's argument. We've got the case. Yeah, we know what you want. It's a privilege to argue before you on this important question. And I appreciate the court's indulgence to resume. Yep. Thank you very much, counsel. We'll take the case under advisement and try to get you a decision as rapidly as we can.